IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Benjamin Brown, | ) | C/A No.: 1:11-2081-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Michael J. Astrue, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civil Rule 73.01(B) (D.S.C.), and the Honorable Richard M. Gergel's November 14, 2011, order referring this matter for disposition. [Entry #16]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals.

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

1

I.    Relevant Background

A.    Procedural History

On March 10, 2009, Plaintiff filed an application for DIB in which he alleged his disability began on November 3, 2003.  Tr. at 115–16.  His application was denied initially and upon reconsideration.  Tr. at 63–64.  On July 22, 2010, Plaintiff had a hearing before an Administrative Law Judge ("ALJ").  Tr. at 24–62 (Hr'g Tr.).  The ALJ issued an unfavorable decision on August 27, 2010, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 9–17.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 8, 2011.  [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 43 years old at the time of the hearing.  Tr. at 115.  He completed two years of college.  Tr. at 167.  His past relevant work ("PRW") was as an artillery gear logical crew member, a tax clerk, a material handler, a shipping and receiving clerk, a forklift operator, a highway maintenance worker, a sales representative distributor of vehicle supplies, a retail store manager, and a heavy equipment operator.  Tr. at 56–57.  He alleges he has been unable to work since November 3, 2003.  Tr. at 115.

2.    Medical History

Plaintiff has a long history of asthma. *See, e.g.*, Tr. at 362. He injured his neck in 2003 and had cervical fusion surgery in May 2004. Tr. at 363. He served in the Army until May 2005. Tr. at 362. His care was thereafter managed by treatment providers from the Department of Veteran's Affairs (VA). Various VA medical records stated Plaintiff had 90% service connected disability, as follows:

- hiatal hernia—10%
- spinal stenosis—30%
- paralysis of the upper radicular nerve group—40%
- migraine headaches—10%
- limited flexion of the knee—10%
- flat foot condition—0%
- asthma, bronchial—60%
- limited flexion of the knee—10%

Tr. at 249, 251, 253, 257, 266.

Plaintiff received documented treatment beginning in 2005. After pulmonary function testing in September 2005, a VA doctor noted severe persistent asthma and possible restrictive disorder and increased Plaintiff's asthma medication dosage. Tr. at 275–77. In November 2005, his complaints included neck pain radiating into shoulders and arms, bilateral knee pain, and intermittent migraine headaches (2–3 a month), and asthma. Tr. at 362. He said he could not do his prior job due to neck pain, but he was exercising regularly and planned to apply for vocational rehabilitation. Tr. at 362–63. On examination, Plaintiff had decreased range of motion of his neck, but had a normal gait and balance, clear lungs, and no extremity edema. Tr. at 363.

As of December 2005, his headaches were controlled on medication. Tr. at 270–71.

In February 2006, a VA treatment provider noted that Plaintiff's asthma had worsened over the past year. Tr. at 273. Plaintiff said he had daily and nocturnal symptoms if he did not use his inhaler before bed time, but he never had to have emergency treatment for asthma and was "using enough medicine to take care of the symptoms at home." Tr. at 273, 356–57. Later that month, he reported difficulty sleeping due to neck pain and numbness in his upper extremities when sleeping, but said his pain was overall controlled on medication. Tr. at 352. The VA treatment provider noted that Plaintiff's neurological examination was stable. *Id.*

The following month, a VA treatment provider noted that Plaintiff's asthma seemed to have responded positively to the recent changes in his medication dosage. Tr. at 347–49. In May 2006, Plaintiff walked into the VA clinic without difficulty, had 97% oxygen saturation on room air, and voiced no concerns. Tr. at 347. In June 2006, pulmonary testing showed moderately severe obstruction with a positive bronchodilator (medication) response. Tr. at 268.

As of July 2006, he was walking 2–3 miles every other day, was independent in his activities of daily living ("ADLs"), and his asthma and neurological status were stable. Tr. at 339–40. Later that month, he reported that he felt "much improved" and that his functional capacity had "significantly improved" after his asthma medication was increased. Tr. at 344, 346.

Pulmonary function testing in October 2006 showed severe obstruction without bronchodilator response. Tr. at 264. The VA treatment provider noted that Plaintiff's asthma "[a]llways responds to [medication] and [he] has no limitations in physical activity." Tr. at 333–34.

Plaintiff had knee surgery for a ruptured tendon in December 2006. Tr. at 320.

Electrodiagnostic testing on May 10, 2007, revealed bilateral carpal tunnel syndrome. Tr. at 225–26.

In July 2007, a VA treatment provider again noted that Plaintiff's asthma "symptoms at present do not limit his activity." Tr. at 328. On examination, he had mild wheezing, but was in no acute distress and had no extremity edema. Tr. at 330.

A chest x-ray in July 2007 showed no sign of active disease, some irregular density of the right humeral head, and a cervical fusion plate (from Plaintiff's prior surgery). Tr. at 234, 330. Imaging of Plaintiff's neck in July 2007 showed adenoidal soft tissue hypertrophy (similar to that shown in 2005); an intact cervical fusion at C6–7; and mild discogenic changes. Tr. at 237–38.

Plaintiff also had foot and knee x-rays taken in July 2007. Tr. at 235–37. The foot x-rays showed bone spurs, worse on the right, and other minor findings. Tr. at 235. The knee x-rays showed a new patella tendon rupture with continued soft tissue swelling of the left knee; quadriceps atrophy in both thighs, worse on the left; and medial compartment osteoarthritis of the right knee. Tr. at 236–37.

Plaintiff was treated for carpal tunnel syndrome on July 10, 2007. Tr. at 224. The treating physician told him to wear his splints only at night and that the splints were not an obstacle to work. *Id.*

In August 2007, a VA treatment provider noted Plaintiff was off work as a mechanic, but that he planned to return to school for job retraining after his knee healed. Tr. at 320. An examination showed slightly decreased extension of the knee, an antalgic gait, normal balance, and clear lungs. *Id.* The provider noted that Plaintiff's back and neck pain were controlled, and that his asthma was stable. *Id.* Pulmonary testing in August 2007 showed severe obstruction with significant bronchodilator responsiveness. Tr. at 262–63.

In October 2007, Plaintiff reported he was working as a mechanic, which aggravated his neck, back, and knee pain. Tr. at 318. He requested an orthopedic consult for his knee pain and a neurological consult for his neck, back, and shoulder pain. Tr. at 317.

Plaintiff was seen in follow-up for carpal tunnel syndrome on October 23, 2007. Tr. at 223. Electrodiagnostic test results showed moderate bilateral carpal tunnel syndrome with no progress in the past five months. Tr. 221–23. The treating physician suggested possible surgical decompression. Tr. at 220–23. Later in October 2007, Plaintiff was wearing splints for carpal tunnel syndrome, but said his pain (multiple areas) was mostly controlled. Tr. at 323. He expressed concern that he could not be as active as he wanted to because of neck and knee pain. *Id.*

On October 30, 2007, Plaintiff requested a neurology consult regarding his neck and back pain. Tr. at 315.

An MRI of Plaintiff's left knee in November 2007 showed changes consistent with chronic disease of the patella tendon and, to a lesser extent, the distal quadriceps tendon; a possible prior patella tendon tear; and meniscal changes. Tr. at 230–31. An MRI of the right knee showed chronic changes of a quadriceps tendon with the tendon still appearing intact and changes to the lateral meniscus, including cyst formation and an irregular mass-like formation. Tr. at 232–33. The radiologist recommended an orthopedic consultation. Tr. at 231.

When Plaintiff followed up for the MRI results, he reported neck pain that radiated into his right arm when he turned his head and pain in both knees that limited his activity. Tr. at 311–12. He told the treatment provider that he was satisfied with current pain control. Tr. at 312. Plaintiff said he was unable to work due to pain and that he still could not fully extend his left knee. *Id.* An examination of the left knee showed evidence of the prior surgery, mild effusion, and slightly decreased extension. *Id.* He had full range of motion and no effusion in his right knee. *Id.* He had an antalgic gait and decreased muscle bulk in his right upper extremity, but moved all four of his extremities equally and had normal balance. *Id.* The VA treatment provider noted that Plaintiff's neurological examination was stable and that his pain was controlled on medication. *Id.* The provider recommended that Plaintiff avoid strenuous exercise, running, jumping, and twisting due to his knee problems. *Id.*

As of December 2007, Plaintiff was doing well on his asthma medications, had clear lungs, and said he was "doing much better." Tr. at 305. He reported that he could walk up the stairs more easily and laugh without coughing and being short of breath. Tr. at 307. He was wearing neck brace, which he said was due to pain from a "pin" in his neck. Tr. at 305.

On January 9, 2008, Plaintiff saw Robert Bowles, M.D., an orthopedist at the VA, for complaints of bilateral knee pain and left quadriceps weakness. Tr. at 258–59. Dr. Bowles noted Plaintiff had done "fairly well" following surgical repair of his left knee. Tr. at 259. On examination, Plaintiff's left knee had some limitation of motion and crepitus (popping sounds), a high knee cap, and no joint line tenderness, effusion, or instability to stresses. *Id.* The right knee had full motion with crepitus and no effusion or instability to stresses. *Id.* Dr. Bowles said imaging showed quadriceps weakness in both thighs, worse on the left; patellofemoral disease, worse on the left; and medial compartment osteoarthritis of the right knee. *Id.* He diagnosed status post patellar tendon rupture and patellofemoral chondoromalacia. *Id.* He recommended physical therapy for quadriceps strengthening, but not surgery. *Id.*; *see also* Tr. at 303–04.

In April 2008, Plaintiff followed up at the VA for neck and knee pain. Tr. at 299. He said he was trying to stay active and that physical therapy had improved his balance and pain. *Id.* On examination, he had an antalgic gait, but normal balance, stable joints, and clear lungs. *Id.* The treatment provider noted that Plaintiff's neurological examination was stable, that his knees had improved stability with physical therapy, that Plaintiff was satisfied with his current pain control, that his migraines were controlled on

8

medications, and that his asthma was stable.  Tr. at 299–300.  His asthma continued to be "well controlled" as of July 2008.  Tr. at 295–97.

A chest x-ray in August 2008 showed no sign of active disease and an unchanged cervical fusion plate (from Plaintiff's prior surgery).  Tr. at 228.  Foot x-rays showed possible prior trauma and valgus angulation of both great toes.   Tr. at 229–30.  Pulmonary function tests in August 2008 showed "moderately severe airway obstruction" with significant bronchodialator response.  Tr. at 247–48.

In February 2009, Plaintiff complained of neck, back, and knee pain.  Tr. at 286.  He reported that he was trying to stay active, was exercising a little more, and had decreased right shoulder pain and increased range of motion.  *Id.*  He also said he was having migraines less often and responded well to his current medications.  *Id.*  On examination, he had an antalgic gait, but normal balance and clear lungs.  *Id.*  The treatment provider's diagnoses included degenerative disc disease of the cervical spine and degenerative joint disease of the knees.  *Id.*  She concluded that Plaintiff "remain[ed] satisfied with current pain control," that his migraines were stable and controlled; and that his asthma was stable.  *Id.*

In a report of contact dated May 4, 2009, Plaintiff stated that he could not look down for any length of time, could sit for only 30 minutes at a time, and could stand for even less time.  Tr. at 171.

On August 20, 2009, Plaintiff saw Blake Moore, M.D., for an evaluation in connection with his application for benefits.  Tr. at 386–89.  Plaintiff said he last worked in 2006 as a mechanic, but had to quit due to neck pain.  Tr. at 387.  He reported severe

difficulties dressing himself. *Id.* He said he could lift 20 pounds, stand 40 minutes at a time, sit 40 minutes at a time, and walk on a level surface for about 25 minutes at a time *Id.* He said he could not do household chores such as sweeping, mopping, and vacuuming, but could drive and do some limited cooking and shopping. *Id.* He said he used an assistive walking device. Tr. at 388. On examination, he was in no acute distress and had 96% oxygen saturation on room air. Tr. at 387. He had a widened stance (gait); relatively poor balance; intact pulses; full grip strength; mild atrophy of right deltoid muscle with full shoulder range of motion; some reduced range of motion of the left shoulder, neck, and back; the ability to stand on his heels and toes briefly, and full motor strength. Tr. at 388, *see also* Tr. at 385–86. Neck x-rays showed post-operative and degenerative changes. Tr. at 381. Left knee x-rays showed an abnormal left knee with upward positioning of the knee cap and evidence of old injury and some heterotopic calcification and bone formation. *Id.* Right knee x-rays showed degenerative changes with marginal spurring. *Id.*

On September 1, 2009, state-agency consultant George Keller III, M.D., opined Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand or walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; was limited in reaching in all directions; and should avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. Tr. at 390–97.

On September 24, 2009, state-agency consultant Katrina Doig, M.D., reviewed the record and concurred with Dr. Keller's opinions except that Dr. Doig also opined that Plaintiff was limited in pushing and/or pulling with his lower extremities. Tr. at 406–13.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the July 22, 2010, hearing, Plaintiff testified that he did not have any medical records in addition to those that were already in the record. Tr. at 32. He also stated that records from his most recent medical treatment were included in the record. *Id.*

He testified that he left the military in May 2005. Tr. at 35. He said that between November 3, 2003, his alleged onset date, and May 22, 2005, when he got out of the Army, he worked at a "tax place," where he gave people papers and showed them where to sit until they were called. Tr. at 36, 38. He testified that unless he had doctor appointments, he worked from four to six hours a day with an additional two-hour lunch break. Tr. at 37–38. He said he was able to do the job, and that the only medical problem affecting his ability to perform the job was his neck pain (as he had not yet had neck surgery). *Id.* Plaintiff testified his asthma did not affect his ability to perform the job and that he did not yet have any knee problems. *Id.* He testified that the heaviest thing he had to lift was a chair (weighing approximately 20 pounds) and that he only did that occasionally. Tr. at 39. He said he tried to work for a short time rebuilding heating and air conditioning units after he left the military. Tr. at 40. He testified that his VA disability rating was "from 90% to 100% because [he was] not working." *Id.*

11

Plaintiff said he could not work because of his medications, neck pain, severe weakness in his right hand, and extreme knee pain.  Tr. at 41–42.  He said he had worn a neck brace for part of each day since 2006.  Tr. at 42.  He said he never had surgery for carpal tunnel syndrome.  Tr. at 47.  He said his hiatal hernia sometimes caused abdominal pain and gas and that he had five or six migraine headaches a month.  Tr. at 53.  Plaintiff also stated that he took daily medications for asthma.  Tr. at 54.

Regarding his activities, Plaintiff testified that he drove occasionally, picked his children up from school, and picked up food.  Tr. at 42.  He stated that he did not drive every day because his neck would swell up.  Tr. at 43.  He said he had trouble walking due to low back and knee pain, but could walk 50 yards.  *Id.*  He said he sometimes went to the mall, but needed a "buggy" to ride on.  Tr. at 44.  Plaintiff testified that he had eight children, and that he had been the primary caregiver for three of them since 2006.  Tr. at 44–45.  He further stated that he ironed, sometimes cooked, and could do light housework, and that he had no problem watching television or reading.  Tr. at 45, 47.  He testified that his children helped him around the house with cooking and cleaning.  Tr. at 45, 48.  Finally, Plaintiff stated that he had not had any training or schooling since leaving the military.  Tr. at 49.

> b.    Vocational Expert Testimony

Vocational Expert ("VE") Mark Stefnicki reviewed the record and testified at the hearing.  Tr. at 55.  The VE categorized Plaintiff's PRW as follows: as an artillery gear logical crew member as light, skilled work; as a tax clerk as sedentary, semi-skilled work; as a material handler as heavy, semi-skilled work; as a shipping and receiving clerk as

medium, skilled work; as a forklift operator as medium, semi-skilled work; as a highway maintenance worker as medium, semi-skilled work; as a sales representative distributor of vehicle supplies as light, skilled work; as a retail store manager as light, skilled work; and as a heavy equipment operator as medium, skilled work.  Tr. at 56–57.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work, but was further limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; never climbing ladders, ropes, or scaffolding; never engaging in overhead reaching bilaterally; avoiding moderate exposure to workplace hazards and to irritants such as fumes, odors, dusts, gases; and frequently engaging in bilateral handling and fingering.  Tr. at 58–59.  The VE testified that the hypothetical individual could perform Plaintiff's PRW as a tax clerk, but none of his other PRW.  Tr. at 59.  The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform.  *Id.*  The VE identified the following sedentary positions: telemarketer, surveillance system monitor, and telephone information clerk.  Tr. at 59–60.

### 2.     The ALJ's Findings

In his August 27, 2010, decision, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.
2.     The claimant has not engaged in substantial gainful activity since November 3, 2003, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.     The claimant has the following severe impairments: status post left patella tendon repair; status post cervical fusion; degenerative disc disease;

degenerative joint disease; asthma; migraine headaches; bilateral foot problems; and carpal tunnel syndrome (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work[FN1] as defined in 20 CFR 404.1567(a) with only occasional climbing ramps/stairs, balancing, stooping, kneeling, crouching and crawling and no climbing ladders/ropes/scaffolds, or bilateral overhead reaching. The claimant is also limited to frequent bilateral handling and fingering and should avoid more than moderate exposure to respiratory irritants (such as fumes, gases, etc.) and work place hazards.

6. The claimant is capable of performing past relevant work as a tax clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from November 3, 2003, through the date of this decision (20 CFR 404.1520(f)).

FN 1: Sedentary work is described by the Commissioner of the Social Security Administration as requiring lifting and carrying up to 10 pounds occasionally and lesser amounts frequently, sitting for 6 hours in an 8-hour day, and standing and walking occasionally (2 hours in an 8-hour day).

Tr. at 9–17.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) The ALJ failed to evaluate the combined effect of Plaintiff's impairments;

2) The ALJ's findings at steps four and five are not supported by substantial evidence; and

3) The ALJ performed a flawed credibility analysis.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured

for benefits, who are not of retirement age, who properly apply, and who are under a

"disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last for
> at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations

promulgated under the Act have reduced the statutory definition of disability to a series

of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983)

(discussing considerations and noting "need for efficiency" in considering disability

claims).  An examiner must consider the following:  (1) whether the claimant is engaged

in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[1] (4) whether such

---

[1]  The Commissioner's regulations include an extensive list of impairments ("the
Listings" or "Listed impairments") the Agency considers disabling without the need to
assess whether there are any jobs a claimant could do. The Agency considers the Listed
impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to
prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a
claimant meets or equals all criteria of any of the Listed impairments for at least one year,
he will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii).
To meet or equal one of these Listings, the claimant must establish that his impairments
match several specific criteria or be "at least equal in severity and duration to [those]
criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

impairment prevents claimant from performing PRW,[2] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls*

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

17

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    B.    Analysis

    1.    The ALJ Properly Considered Plaintiff's Combined Impairments

Plaintiff argues that the ALJ failed to make particularized findings regarding the combined effects of his impairments. [Entry #21 at 11–12]. The Commissioner contends the ALJ's decision is sufficient to show that he adequately considered the combined effects of Plaintiff's impairments in making his disability determination. [Entry #22 at 15–18].

When, as here, a claimant has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50.

"As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

In this case, the ALJ first determined Plaintiff suffered from severe impairments of status post left patella tendon repair; status post cervical fusion; degenerative disc disease; degenerative joint disease; asthma; migraine headaches; bilateral foot problems; and carpal tunnel syndrome. Tr. at 11. After concluding Plaintiff did not have an impairment or combination of impairments of listing-level severity, the ALJ completed a detailed RFC analysis. Tr. at 12–15. In his RFC analysis, he identified each of Plaintiff's impairments and the corresponding functional limitations. Tr. at 15. He then made the following statement: "I considered the combination of the claimant's impairments as well as any problems he might encounter as [a] result of his alleged pain by restricting him from exposure to work place hazards." *Id.*

The court finds the ALJ's decision sufficient to demonstrate that he considered Plaintiff's combined impairments. Although Plaintiff argues the link between his impairments and the restriction from exposure to workplace hazards is not clear, this argument is a red herring. The issue before the court is whether the ALJ adequately considered Plaintiff's impairments. Because Plaintiff's RFC includes limitations tied to numerous distinct impairments and the ALJ specifically stated in the RFC analysis that he considered Plaintiff's impairments in combination, the ALJ satisfied his obligation under *Walker*. *See Thornsberry v. Astrue*, C/A No. 4:08-475-HMH-TER, 2010 WL 146483, at *5 (D.S.C. Jan. 12, 2010) (finding that "while the ALJ could have been more explicit in stating that his discussion dealt with the combination of [the plaintiff's]

impairments, his overall findings adequately evaluate the combined effect of [the plaintiff's] impairments"). Furthermore, Plaintiff has offered no explanation of how more discussion of his combined impairments may have changed the outcome of this case or identified any additional restrictions that would flow from his combined impairments. For these reasons, the court finds remand on this issue unwarranted. *See Brown v. Astrue*, C/A No. 0:10-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012) (finding that Fourth Circuit precedent issued after *Walker* suggested that *Walker* was not meant to be used as a trap for the Commissioner).

> 2.    Any Error in Finding Plaintiff Could Return to PRW Was Harmless

Plaintiff next argues that the ALJ's conclusion that Plaintiff could return to PRW as a tax clerk is not supported by substantial evidence. [Entry #21 at 13]. In support of his argument, Plaintiff contends the ALJ erred in "failing to verify" his testimony that he received a 90 percent impairment rating from the VA.[3] *Id.* at 12. Plaintiff also argues that the ALJ should have obtained records clarifying Plaintiff's duties when he worked as a tax clerk. *Id.* He further argues that the ALJ's flawed conclusion at step four necessarily resulted in legal error at step five. *Id.* at 13. The Commissioner responds that the ALJ properly developed the record regarding Plaintiff's PRW as a tax clerk. [Entry #22 at 19]. The Commissioner further argues that even if the ALJ erred in finding Plaintiff could perform PRW, the error was harmless because he also found there were

---

[3] The court notes that the impairment rating was documented in the medical records. Tr. at 249, 251, 253, 257, 266. As Plaintiff concedes, however, the ALJ was not bound by the impairment rating. [Entry #21 at 12].

other jobs in the national economy that someone with Plaintiff's RFC could perform.  *Id.* at 19–20.

At step four, the ALJ determines whether a claimant's impairments prevent him from performing PRW.  *See* 20 C.F.R. § 404.1520.  If a decision regarding disability cannot be made at step four, the ALJ moves to step five and considers whether the claimant's impairments prevent him from engaging in substantial gainful employment. *Id.*

Here, the ALJ determined at step four that Plaintiff could return to PRW as a tax clerk.  Tr. at 16.  Plaintiff's contends this finding was in error.  The ALJ alternatively found, however, that based on Plaintiff's age, education, work experience, and RFC, he could perform other jobs existing in significant numbers in the national economy.  *Id.* Specifically, the ALJ relied on the VE's testimony that a hypothetical individual with Plaintiff's vocational profile and RFC could work as a telemarketer, surveillance system monitor, and telephone information clerk.  Tr. at 16–17.  Thus, even if the ALJ had not found Plaintiff capable of returning to PRW, the ALJ's alternative findings support his ultimate conclusion that Plaintiff is not disabled.  Based on the foregoing, the court finds that any error by the ALJ in concluding that Plaintiff could return to PRW was harmless. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error").

Plaintiff argues that the alternative finding is unsound because it is premised, in part, on his PRW as a tax clerk.  [Entry #23 at 3–4].  In posing the hypothetical to the VE,

the ALJ asked the VE to assume an individual of Plaintiff's "age, education, and work experience." Tr. at 58. Plaintiff contends that the "work experience" portion of the hypothetical was flawed because his description of his duties as a tax clerk does not correspond with the DOT definition relied upon by the VE. [Entry #23 at 3; Entry #21 at 12–13]. While the court agrees that Plaintiff's description of his work is significantly different from the DOT definition, this discrepancy does not invalidate the VE's testimony or the ALJ's alternative finding. The VE did not conclude Plaintiff had any transferrable skills from his work as a tax clerk and his work, regardless of the duties, is unrelated to the jobs advanced by the VE. Consequently, the court finds that any error in classifying Plaintiff's prior work as a tax clerk was also harmless.

> 3.    The ALJ's Credibility Determination is Supported by Substantial Evidence

Plaintiff also argues that the ALJ performed a flawed credibility analysis. [Entry #21 at 13]. Specifically, Plaintiff argues the ALJ mischaracterized his ADLs and failed to properly develop the record regarding his recent medical treatment. *Id.* at 14–15. The Commissioner argues the ALJ's decision is supported by substantial evidence and should not be disturbed. [Entry #22 at 12–14].

Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged. *See* 20 C.F.R. § 404.1529; 20 C.F.R. § 416.929; SSR 96-7p; *Craig v. Chater*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-

based two-part test for evaluating pain). The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain." 76 F.3d at 594 (internal quotation omitted). Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." *Id.* at 595. This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, ¶ 4.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, ¶ 5. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other

symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process.  *See Craig,* 76 F.3d at 591–96. The ALJ found Plaintiff's impairments could reasonably be expected to cause the symptoms he alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of his symptoms was "not credible to the extent" the testimony was inconsistent with the ALJ's determination of his RFC.  Tr. at 14.

The ALJ found that the record did not support Plaintiff's claims of disabling impairments.  Plaintiff had received no significant recent treatment for his cervical spine problems and reported in February 2009 that he was satisfied with his current pain control.  Tr. at 14.  The record reflected that Plaintiff's migraines were well controlled with medication, including over-the-counter analgesics and that, as of February 2009, they were occurring less often and responding well to medication.  *Id.*  The ALJ noted Plaintiff had not complained of severe symptoms related to his hiatal hernia and had not experienced any significant weight loss as would be expected.  *Id.*  With regard to Plaintiff's asthma, the ALJ noted that the condition was described as stable in the most

24

recent treatment note and Plaintiff had never sought emergency care or intubation for his asthma. *Id.*

Plaintiff dismisses the foregoing findings as a "re-examination of the medical evidence" and contends the ALJ failed to properly consider the factors set forth in SSR 96-7p. [Entry #23 at 1]. To the contrary, the evidence cited by the ALJ directly addressed the effectiveness of Plaintiff's medications, a factor listed in SSR 96-7p. These records were highly probative of Plaintiff's credibility because, "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1165–6 (4th Cir. 1986).

In discounting Plaintiff's credibility, the ALJ further stated that Plaintiff had not received any medical treatment since February 2009. *Id.* Plaintiff suggests that additional records may have existed, but that the ALJ failed to properly develop the record. [Entry #21 at 14]. This argument is perplexing because the ALJ asked Plaintiff at the hearing whether his most recent medical treatment was contained in the record. Tr. at 32. Plaintiff responded that it was. *Id.* Plaintiff fails to articulate what further steps the ALJ should have taken to ensure the record was fully developed, and the court finds that the ALJ did all that was required of him.

Finally, in finding Plaintiff less than credible, the ALJ cited to his ADLs. Tr. at 14. The ALJ referenced a May 2009 interview in which Plaintiff indicated that he attended his children's school activities, performed light housework, and shopped. *Id.* The ALJ also noted that Plaintiff had been responsible for his children's care since 2006

and that the activities required in parenting are not consistent with Plaintiff's alleged functional limitations.  *Id.*

Plaintiff argues the ALJ's characterization of his ADLs conflicts with other evidence in the record.  [Entry #21 at 14].  The court has reviewed the records cited by Plaintiff in his brief in support of his credibility.  Although some of these selective records may support Plaintiff's credibility, they do not render the ALJ's decision unsupported.  *Craig*, 76 F.3d at 589 (stating that the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]"); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (holding that it is the ALJ's responsibility, not the court's, to determine the weight of evidence and resolve conflicts of evidence); *Blalock*, 483 F.2d at 775 (indicating that even if the court disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence).

Because the ALJ's decision to discount Plaintiff's credibility is supported by substantial evidence, the court denies remand on this issue.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law.  Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

February 15, 2013                              Shiva V. Hodges
Columbia, South Carolina                       United States Magistrate Judge